Below is an opinion of the court.

Below is the court's report and recommendation.

_Trish M. Brown_
TRISH M. BROWN
U.S. Bankruptcy Judge

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>DATA SYSTEMS, INC.,<br><br>Debtor. | Bankruptcy Case<br>No.  16-30477-tmb11 |
| WILLIAM F. HOLDNER,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD A. KREITZBERG; STEVEN KREITZBERG; AMY E. MITCHELL, trustee; and JUSTIN D. LEONARD, attorney,<br><br>Defendants. | Adv. Proc. No. 19-3028-tmb<br><br>MEMORANDUM OPINION[1]<br><br>REPORT AND RECOMMENDATION |

**Table of Contents**

I. Procedural Background ................................................................................................ 3

  A.  The Debtor's Background ................................................................................. 3

  B.  The Chapter 11 Case ........................................................................................ 4

  C.  Appeal of the Confirmation Order ................................................................... 6

---

[1] This disposition is specific to this case and is not intended for publication or to have a controlling effect on other cases.  It may, however, be cited for whatever persuasive value it may have.

    D.   The Present Litigation ................................................................................ 7

II. Jurisdiction ............................................................................................. 10

III. Motions to Dismiss ................................................................................ 10

    A.   Misrepresentation in the Purchase of Shares .................................... 11

    B.   Breach of Contract ............................................................................ 15

    C.   Breach of Fiduciary Duties (Kreitzberg Defendants) ....................... 17

    D.   Breach of Fiduciary Duties (Estate Professionals) ........................... 18

IV. Vexatious Litigant Motion .................................................................... 19

    A.   Standards .......................................................................................... 20

    B.   Procedural Safeguards ...................................................................... 21

        1.   Notice and an Opportunity to be Heard ...................................... 21

        2.   History of Litigation ................................................................... 21

    C.   Findings of Frivolousness and Harassment ...................................... 23

        1.   Holder's Litigation is the Product of a Grudge against Richard Kreitzberg ............... 24

        2.   Holder's Claim that He Represents the Interests of Minority Shareholders Lacks Credibility ................................................. 25

        3.   Holder's Own Admissions Display a Lack of Respect for the Judicial Process ......... 27

    D.   Expense and Burden on Opposing Parties and the Court ................. 32

    E.   Terms of the Prefiling Order ............................................................ 34

V. Conclusion ............................................................................................. 36

* * *

       This matter came before the court on motions to dismiss filed by the defendants Richard and Steven Kreitzberg (collectively the "<u>Kreitzberg Defendants</u>") and defendants Amy Mitchell and Justin Leonard (collectively the "<u>Estate Professionals</u>"), as well as a Motion to Declare William Holdner a Vexatious Litigant filed by the Kreitzberg Defendants. The relevant procedural history is discussed in greater detail below.

       As explained in this opinion, after due consideration of the arguments and evidence advanced by the parties, I will: (1) dismiss plaintiff's first and fourth claims for relief, (2) recommend that the U.S. District Court for the District of Oregon ("<u>District Court</u>") withdraw the reference as to plaintiff's second and third claims for relief, (3) enter an injunction in this court preventing plaintiff from commencing certain adversary proceedings or contested matters

unless the court has approved a proposed pleading or motion submitted by plaintiff in accordance with this opinion, and (4) submit this opinion as a report and recommendation to the District Court, recommending that it enter a similar prefiling order designating Mr. Holdner as a vexatious litigant.

## I. Procedural Background

This matter has a complicated procedural history, in part due to plaintiff William Holdner's tendency to multiply proceedings and pursue meritless appeals. A brief summary of the relevant history is set forth below.

### A. The Debtor's Background

Debtor Data Systems, Inc. was originally formed over 50 years ago as data processing company. Sometime in the early 1990s, changes in the computing industry caused Debtor to discontinue its previous line of business and focus solely on maintaining the real property it owned (a two-story office building that used to serve as its headquarters, and five smaller properties close to the main building). *In re Data Systems Inc.*, 561 B.R. 838, 839-840 (Bankr. D. Or. 2016) [hereinafter, the "Confirmation Ruling"]. According to Debtor's own valuation, the main office building accounts for about two-thirds of the value of the entire company. Prior to this chapter 11 case, half of the main building was leased to Mr. Holdner's accounting firm at the same monthly rent that was originally set in 1986. *Id.* at 840.

In 2015, Holdner (who, at the time, served as Debtor's president) took steps to sell the main office building. Defendant Richard Kreitzberg, a shareholder of the Debtor, filed a derivative action in Multnomah County Circuit Court in March 2015 (Case No. 15CV07240, the "State Court Litigation"). Among other things, Kreitzberg's suit alleged that Holdner lacked authority to sell the building, and that he had breached his fiduciary duties in various ways. In January 2016, Debtor, at the direction of Mr. Holdner, filed suit against Kreitzberg (and an affiliated limited liability company) in District Court, alleging that Kreitzberg had wrongfully and fraudulently attempted to gain control over Debtor by making a tender offer to purchase shares of Debtor's common stock for $7 per share (Case No. 16-cv-110-SI, the "Federal Litigation").

B.    The Chapter 11 Case (Case No. 16-30477-tmb11, the "Main Case")

The Oregon state court entered a preliminary injunction in favor of Mr. Kreitzberg in the

State Court Litigation.  Before the court could rule on further relief, Debtor filed a voluntary

chapter 11 petition on February 11, 2016, thereby staying the State Court Litigation.  Conf.

Ruling, 561 B.R. at 840-841.  Kreitzberg moved to dismiss the chapter 11 case or, in the

alternative, appoint a trustee.  The Hon. Randall L. Dunn of this court[2] denied the motion to

dismiss but ordered the United States Trustee to appoint a chapter 11 trustee.  *Id.*  Defendant

Amy Mitchell was appointed trustee on May 4, 2016.  Main Case ECF No. 79 (Appointment of

Ch. 11 Trustee).

On September 30, 2016, Mitchell filed a First Amended Plan of Reorganization (the

"Plan," Main Case ECF No. 155).  The Plan provided for the payment in full of all non-insider

creditors (Plan §§ 4.1-4.4); however, as of the petition date the Debtor had only $4,043.32 in

cash (Conf. Ruling, 561 B.R. at 841).  Accordingly, the Plan required an infusion of capital to

fund plan payments and the ongoing operations of the reorganized debtor.  Mitchell proposed

obtaining this funding by selling between 160,000 and 170,000 new shares of common stock.  *Id.*

at 842.  Richard Kreitzberg agreed to purchase this new stock at $7 per share, subject to the

ability of other parties to submit higher bids.  *Id.*

The Plan placed existing shareholders in Class 5, and gave them two options: (1) they

could retain their shares (with the caveat that such shares could be diluted by the sale of new

stock to Kreitzberg), or (2) they could "[s]ell their shares . . . at a price that shall be not less than

$7 per share [or potentially more, in the event of an overbid], in exchange for a full and

unconditional release of the Debtor and Reorganized Debtor."  Plan § 4.5.  The $7 per share sales

price represented a premium of approximately 6% over the estimated liquidation value of the

Debtor.  Second Amended Disclosure Statement Regarding Trustee's Plan of Reorganization

Dated Sept. 30, 2016 ("Disclosure Statement," Main Case ECF No. 161), at 7.

---

[2] Judge Dunn presided over Debtor's chapter 11 case until his retirement in January 2017, at which time the case was reassigned to me.

On November 8, 2016, Mr. Holdner, along with fellow shareholders Jane Baum and Gary Maffei, filed two objections. First, Holdner renewed an earlier objection to confirmation, articulating a litany of grievances, including an allegation that "the Trustee is not a disinterested party." Renewal of Shareholders' Objection (the "<u>Disclosure Statement Objection</u>," Main Case ECF No. 181), at 1-2. Second, Holdner and the joint objectors filed a separate objection opposing confirmation of the Plan under the "cramdown" provisions of § 1129(b). Objection to Any Proposed Cram Down in an Amended Plan of Reorganization (Main Case ECF No. 183). No other parties-in-interest objected to confirmation.

The only class that did not vote to accept the Plan was Class 5 (holders of Debtor's common stock). Of the Class 5 interest holders who voted, shareholders owning 62% of the total voting shares voted to confirm the plan, which is short of the two-thirds required by § 1126(d).[3] Summary of Acceptances & Rejections ("<u>Ballot Summary</u>," Main Case ECF No. 191). Mitchell then pursued confirmation via § 1129(b)'s cramdown provisions. Judge Dunn held a confirmation hearing on November 22, 2016. Counsel for Debtor, Ms. Mitchell, counsel for the U.S. Trustee, and Richard Kreitzberg were present, as was Mr. Holdner. During the confirmation hearing, the court received testimony from Richard Kreitzberg, Ms. Mitchell, Robert McGaughey (special counsel to the Debtor for securities law matters), and Mr. Holdner. *See generally*, Confirmation Hearing Transcript (Main Case ECF No. 276).

At the confirmation hearing, Ms. Mitchell testified that, if the Plan was confirmed, she would continue managing the Debtor for a brief period until shareholders could elect a new board of directors. Other than that interim management, Mitchell's only other duties would be to collect and disburse funds pursuant to the Plan. Conf. Hrg. Tr. at 54:23-55:6. Mitchell further expressed concerns about the threat of litigation from Mr. Holdner, testifying that "Mr. Holdner has repeatedly indicated that he thinks there is tremendous personal liability for me and perhaps my professionals as a result of this case. He's threatened to 'bury' me, he's indicated I'll be

---

[3] According to Debtor's books and records, there are approximately 300 shareholders (although Debtor lacks valid contact information for many of this number). Twenty-five shareholders submitted ballots to the trustee, of which twenty-three ballots (representing 92% of Class 5 voters holding 62% of the voting shares) voted in favor of confirmation. The two shareholders that voted against confirmation were Ms. Baum and Mr. Maffei.

professionally embarrassed, has made numerous threats about that." *Id.* at 46:3-11 (Holdner, for his part, disputed this testimony). The Plan contained a provision designed to allow valid claims against the trustee, but to also provide her with protection against harassment. Section 14.3 of the Plan (the "Release Clause") provides that, following Mitchell's completion of her duties, the court would set a bar date, and any "claim or cause of action arising out of the discharge of the powers and duties conferred upon the Trustee (and each of her respective employees, agents, accountants, attorneys, and representatives) in this case, by the Plan, any order of the Court, or applicable law" must be brought by the bar date or would otherwise be enjoined. Order Confirming Plan ("Confirmation Order," Main Case ECF No. 211) at ¶ 6.[4]

Following the confirmation hearing, the court issued the Confirmation Ruling, addressed Mr. Holdner's various objections, overruled them, and confirmed the Plan. On December 7, 2016, the court entered the Confirmation Order. That same day, Mitchell gave notice that she would accept bids for purchase of the common stock that was to be issued for purposes of funding the confirmed Plan. Order Authorizing Issuance and Sale of Common Stock of the Debtor ("Stock Issuance Order," Main Case ECF No. 226) at ¶ 2-3. No overbids were received, and on December 21, 2016, the court entered an order authorizing Mitchell to issue 170,000 shares of common stock to Richard Kreitzberg for the price of $7 per share. *Id.* at 4. Kreitzberg's purchase of the new shares was consummated on December 23, 2016. Final Report of Plan Agent & Notice of Proposed Order of Injunction ("Final Report," Main Case ECF No. 313) ¶ 27. On May 25, 2018, Ms. Mitchell filed a notice (Main Case ECF No. 314) advising parties that June 28, 2018 was the bar date for claims to be brought pursuant to the Plan's Release Clause.

C.      Appeal of the Confirmation Order

On December 7, 2016, Holdner appealed the Confirmation Order to the District Court (Case No. 16-cv-2346-HZ (the "2016 Appeal")). As the District Court noted, Holdner's opening memorandum (Mem. in Support Review [sic] of Confirmation of Plan ("Holdner Appeal Brief"),

---

[4] Ms. Mitchell and the U.S. Trustee had agreed on the form of the Release Clause prior to the confirmation hearing, but the final language was inserted into the Plan via the Confirmation Order, rather than via a further amended plan.

2016 Appeal ECF No. 7) complied with few, if any, of the requirements of Federal Rule of Bankruptcy Procedure 8014. Notwithstanding this procedural error, the District Court accepted the memorandum, identified six separate arguments, and analyzed each of those arguments in a twenty-page opinion issued on March 14, 2017. Opinion & Order ("USDC Opinion on Appeal, 2016 Appeal ECF No. 35). After thorough consideration of Holdner's arguments, the District Court found no error on the part of the Bankruptcy Court and affirmed the Confirmation Order. *Id.* Mr. Holdner appealed the District Court's order to the Ninth Circuit Court of Appeals (Case No. 17-35319 (the "2017 Appeal")), which affirmed the District Court in a memorandum opinion entered on January 23, 2018. 2017 Appeal ECF No. 13.

D.     The Present Litigation

On June 15, 2018 (prior to the bar date established under the Release Clause), Mr. Holdner filed a complaint in the District Court (Case No. 18-cv-1054-AC (the "2018 Lawsuit")) alleging four claims for relief. Some claims are asserted against the Estate Professionals, while others appear to be against the Kreitzberg Defendants. On April 23, 2019, the District Court entered an order referring the complaint to this court and allowing Mr. Holdner to file an amended complaint as to the third claim for relief. *See* Order of Referral (ECF No. 8), at 3. Mr. Holdner filed an Amended Complaint (ECF No. 16) on May 13, 2019. As pleaded in the Amended Complaint, Holdner asserts four claims: (1) "mis-representation in the purchase of shares," (2) breach of contract, (3) breach of fiduciary duties by the Kreitzberg Defendants, and (4) breach of fiduciary duties by the Estate Professionals.

On May 16, 2019, Holdner filed a notice of appeal in the District Court, appealing the Order of Referral to the Ninth Circuit Court of Appeals (Ninth Cir. Case No. 19-35432 (the "2019 Appeal")). On May 29, 2019, this court held a status hearing and announced that because the 2019 Appeal appeared to seek review of a patently interlocutory order, the Bankruptcy Court was not divested of jurisdiction, and would therefore take up the matters referred by the District Court without waiting for a ruling from the Ninth Circuit.[5] *See Legalization Assistance Proj. of*

---

[5] The Ninth Circuit dismissed the 2019 Appeal for lack of jurisdiction on October 24, 2019. *See* Order, 2019 Appeal ECF No. 19.

*Los Angeles County AFL-CIO v. Immigration & Naturalization Serv.*, 976 F.2d 1198, 1203 n.5 (9th Cir. 1992), *vacated on other grounds*, 510 U.S. 1007 (1993).

The Estate Professionals filed a motion on June 7, 2019 (ECF No. 18), asking for entry of an order directing Mr. Holdner to provide a more definite statement concerning his allegations that the Estate Professionals were "not disinterested parties." On the same day, the Kreitzberg Defendants filed two motions: (1) a motion to dismiss the first, second, and third causes of action, or in the alternative to strike, or in the alternative to require a more definite statement (the "Kreitzberg MTD," ECF No. 19), and (2) a Motion to Declare William Holdner a Vexatious Litigant (the "Vexatious Litigant Motion," ECF No. 20).

On July 1, 2019, the court issued an order (the "July 1 Order," ECF No. 25) addressing the Estate Professional's motion and the Kreitzberg MTD. In brief, the July 1 Order agreed that the Amended Complaint did not contain factual allegations sufficient for the court to rule on the merits. Given Mr. Holdner's track record of rambling and unfocused arguments, the court decided to specify the areas of confusion and give Mr. Holdner the opportunity to provide missing detail, rather than giving him free rein to file a second amended complaint. July 1 Order at 4-5 (citing *Warth v. Seldin*, 442 U.S. 490, 501 (1975)). To that end, the July 1 Order itemized nine specific questions about the Amended Complaint and ordered Mr. Holdner to file a declaration responding to those questions no later than July 22, 2019. Mr. Holdner did not timely file the required declaration, but instead requested a stay of the July 1 Order until the 2019 Appeal was resolved. Motion for Extension, ECF No. 30. The court denied Holdner's request for a stay, and instructed Holdner to file the required declaration by August 2. Order Re: Motion for Extension, ECF No. 32. Holdner again failed to comply with the July 1 Order by the extended deadline.

On August 9, 2019, the Estate Professionals and the Kreitzberg Defendants jointly requested a status hearing to address the posture of this adversary proceeding. Def. Joint Request for Hrg., ECF No. 38. The court granted the request and set a hearing for September 24,

2019 (the "September 24 Hearing").  At the September 24 Hearing,[6] the court noted that Mr. Holdner had not filed the information required by the July 1 Order.  Mr. Holdner initially responded by arguing that he did not comply with the order because he believed that counsel for the Kreitzberg Defendants had made false statements.  When the court pointed out that actions by opposing counsel were irrelevant to a party's obligation to comply with a court order, Mr. Holdner changed course and argued he did not have to comply with the order because "you wanted me to file it under an adversary procedure and I think it was wrong."  The court then asked Mr. Holdner to confirm that he was refusing to comply with the July 1 Order; rather than addressing the substance of the court's question, Mr. Holdner accused the opposing parties of fraud.  When the court again asked Holdner if he would comply with the July 1 Order, Holdner tried yet another tact, this time alleging that he had never received a copy of the order—an obvious falsehood, given that several weeks earlier, Holdner had attached a copy of the July 1 Order to a document that he filed in the Court of Appeals.  *See* 2019 Appeal ECF No. 13, at 15. The court provided Holdner with a copy of the July 1 Order and read the individual questions contained in the order, one-by-one.  At this point Holdner advanced a fourth reason for not complying with the court's order, stating that "the Court of Appeals wrote me a note that everything was stayed. . . . I assumed that everything was stayed, that they stayed every court order until they ruled on the motions that are pending before the court."[7]  Notwithstanding the meritless and misleading arguments advanced by Mr. Holdner in his series of shifting excuses, the court gave him one last opportunity for compliance, allowing seven days in which Holdner could file a declaration as directed by the July 1 Order.

At the conclusion of the September 24 hearing, the Estate Professionals, through counsel, stated that they would "not object" to dismissal of the adversary proceeding, a statement that the court has construed as an oral motion to dismiss.  The Kreitzberg Defendants waived any further briefing.  On September 30, 2019, Holdner filed a declaration responding to the questions posed

---

[6] Although a transcript of the September 24 Hearing has not been prepared, a recording is publicly available on the adversary proceeding docket.  *See* ECF No. 45.

[7] A review of the docket in the 2019 Appeal reveals no such order.

in the July 1 Order. ECF No. 47 (the "<u>Holdner Declaration</u>"). While the motions to dismiss have been under advisement, Holdner filed an additional motion prematurely seeking to litigate the merits of his case. Request to Determine the Court Procedure in a Resolution of a Shareholder Dispute, Main Case ECF No. 355.

## II. Jurisdiction

As discussed below, Mr. Holdner's first claim for relief appears to allege misconduct as part of the confirmation process. Accordingly, this court has jurisdiction over that claim pursuant the "arising in" provisions of 28 U.S.C. § 1334(b). The first claim is a core matter under 28 U.S.C. § 157(b)(2)(A), (L), (N), and/or (O).

The second and third claims for relief appear to raise matters that are outside this court's jurisdiction. I will therefore not enter a final judgment on those claims.

The fourth claim for relief involves the conduct of a trustee and an estate professional in the discharge of their duties for the estate. Accordingly, this court has "arising in" and "arising under" jurisdiction pursuant to 28 U.S.C. § 1334(b). This claim is a core matter under 28 U.S.C. § 157(b)(2)(A) and (L).

## III. Motions to Dismiss

Defendants seek dismissal of Holdner's claims for lack of standing, failure to state a claim upon which relief can be granted, and claim preclusion. Kreitzberg MTD at 6. These are all matters that are properly raised in a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b). *See Banco Santander de Puerto Rico v. Lopez-Stubbe (In re Colonial Mortg. Bankers Corp.)*, 324 F.2d 12, 16 (1st Cir. 2003) (res judicata/claim preclusion may be adjudicated via Fed. R. Civ. P. 12(b)(6)); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121-1122 (9th Cir. 2010) (constitutional standing may be raised via Fed. R. Civ. P. 12(b)(1)).

When considering a motion under Rule 12(b)(6) (applicable here through Federal Rule of Bankruptcy Procedure 7012(b)), the plaintiff's factual allegations are taken as true. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). A motion to dismiss will be denied where the plaintiff has "allege[d] in the complaint 'enough facts to state a claim to relief that is plausible on

its face.'" *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  For purposes of deciding a motion under Rule 12(b)(6), the court must generally assume that facts alleged in the complaint are true, but conclusory allegations and unreasonable inferences will not defeat a motion to dismiss. *Id.*  In addition, a court need not accept a plaintiff's factual allegations as true if they are clearly contradicted by materials (such as court records) that are properly subject to judicial notice.  *See Intri-Plex Tech. v. Crest Group*, 499 F.3d 1048, 1052 (9th Cir. 2007).  Under Rule 12(b)(1), the plaintiff bears the burden of proving that the court has jurisdiction.  *Wilshire Courtyard v. Calif. Franchise Tax Bd. (In re Wilshire Courtyard)*, 729 F.3d 1279, 1284 (9th Cir. 2013).

As noted previously, the Amended Complaint contains four claims for relief.  I will address them in turn.

A.    <u>Misrepresentation in the Purchase of Shares</u>

The most perplexing problem concerning the first claim is that the Amended Complaint makes repeated reference to a "tender offer" made by Richard Kreitzberg,[8] but Mr. Holdner has steadfastly refused to clarify what tender offer he is referring to.  The only factual allegation in the Amended Complaint that references a tender offer is paragraph 12, which describes a prepetition offer made by Kreitzberg to purchase outstanding shares of the Debtor.  Amend. Compl. ¶ 12 ("In an attempt to obtain control of the company [Richard Kreitzberg] made a 'tender offer' to acquire other shareholders['] stock.").  As that same paragraph notes, Mr. Kreitzberg's tender offer was the subject of the Federal Litigation that Debtor (under Holdner's direction) filed in 2016.  The complaint in the Federal Litigation (Fed. Litig. ECF No. 1)

---

[8] Holdner states that the first claim is pleaded against both Richard and Steven Kreitzberg.  Holdner Decl. at 5.  Yet the Amended Complaint's specific factual allegations against Steven Kreitzberg relate exclusively to post-confirmation management of the reorganized Debtor, with the sole exception of an allegation that both Kreitzberg Defendants "orchestrated a scheme to privatize the company."  Amend. Compl. ¶ 23.  Because the allegation in paragraph 23 of the Amended Complaint is entirely conclusory and fails to state an actionable claim, any attempt to apply the first claim for relief against Steven Kreitzberg fails under the *Twombly/Iqbaal* standard of review.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").  Accordingly, this analysis of Mr. Holdner's first claim focuses only on defendant Richard Kreitzberg.

concerned statements made in an April 27, 2015 tender offer statement (the "April 2015 Offer")

issued by Richard Kreitzberg and his affiliated company RAK Investments, LLC.

Mr. Holdner repeatedly raised the issue of the April 2015 Offer (and various legal

violations be believed Kreitzberg had committed) at the confirmation hearing. Judge Dunn

advised Holdner no less than five times that disputes over the propriety and legality (or lack

thereof) of the April 2015 Offer were not relevant to Debtor's chapter 11 case. Conf. Hrg. Tr.

27:15-17, 28:24-29:1, 107:16-108:9, 113:16-114:11, 120:25-121:1. Mr. Holdner raised the issue

again in the 2016 Appeal (Holdner Appeal Brief at 5), but the District Court did not find any

error on the part of the Bankruptcy Court. More importantly, the first claim for relief in this

matter is not framed as a matter of bankruptcy law, but rather as a direct action for

misrepresentations in an offer for the purchase of shares. Yet Holdner lacks standing to bring

such a claim, since there is no evidence in the record that he ever entered into a contract to sell

shares to Mr. Kreitzberg.

Still, the operative language of Mr. Holdner's first claim leaves doubt about whether the

"tender offer" to which he refers is the April 2015 Offer. Out of an abundance of caution, the

court in its July 1 Order instructed Holdner to "[c]onfirm or deny that the tender offer referred to

in paragraph 12 of the Amended Complaint is the same tender offer that forms the basis for the

complaint in [the Federal Litigation]." Jul. 1 Order at 6. In response, Holdner states as follows:

> Plaintiff denies that the allegations are the basis for the Amended Complaint. The basis
> for the Amended Complaint in Data Systems, Inc. a publicly traded Real Estate Holding
> Corporation, under a confirmed Plan of Reorganization Richard A. Krietzberg [*sic*], as
> the Debtor in Possession, is that under his control and management the corporation is
> incurring substantial losses that will impact adversely the minority shareholders
> investment interests.

Holdner Decl. at 3. This response is difficult to understand (and largely raises issues that are

irrelevant to a claim for misrepresentation), but it does appear to deny that the tender offer

referred to in the complaint is the April 2015 Offer (while simultaneously failing to clarify what

tender offer Mr. Holdner *is* referring to). The record indicates that the April 2015 Offer is the

only tender offer that Mr. Kreitzberg made. *See* Conf. Hrg. Tr. at 9:8-15. Thus, if the April

2015 Offer is not the tender offer that forms the basis for the first claim for relief, then the only

other conceivable transaction that Holdner could be referring to is Richard Kreitzberg's purchase of newly issued stock following confirmation of the Plan. Although not a tender offer for purposes of the Securities Exchange Act,[9] Kreitzberg's purchase of 170,000 shares in December 2016 could roughly be analogized to a purchase under a tender offer. Holdner himself made this analogy in the 2017 Appeal, arguing that the "Plan of Reorganization is nothing more than an adoption and a continuance of Krietzberg's [*sic*] 'Tender Offer' in the purchase of Data Systems, Inc. stock for $7.00 per share." Appellant's Informal Brief (2017 Appeal ECF No. 5) at 10. This interpretation is also most beneficial to Holdner for purposes of defeating the Kreitzberg MTD,[10] so this is the interpretation I will adopt. Accordingly, I will construe the first claim for relief as alleging that Mr. Kreitzberg made misstatements in connection with his acquisition of shares as part of the confirmed Plan.[11]

With this interpretive exercise out of the way, I hold that Holdner's first claim for relief is precluded because it implicates issues that were litigated to a final judgment. The general terms of the stock sale were set forth in the confirmed Plan. Plan §§ 7.1-7.2. If Mr. Holdner believed any of the statements that Kreitzberg made in support of the Plan were inaccurate, it was incumbent on him to raise them those issue during confirmation and in the 2016 Appeal. Holdner did not do so, and therefore any attempt to raise these issues now is barred under the doctrine of *res judicata*. *Robertson v. Isomedix, Inc. (In re Int'l Nutronics)*, 28 F.3d 965, 969 (9th Cir. 1994) ("Res judicata bars all grounds for recovery that *could have been asserted*,

---

[9] The Securities Exchange Act of 1934 creates certain requirements for tender offers, but those provisions do not apply to an offer made by the issuer of the security. 15 U.S.C. § 78n(d)(8)(B).

[10] If the phrase "tender offer" is construed as referring to the April 2015 Offer, then Holdner would lose on the face of the pleadings, because neither the Amended Complaint nor the record in Debtor's chapter 11 case indicates that Holdner ever accepted Kreitzberg's 2015 offer to purchase shares. Accordingly, even if Kreitzberg did make the misstatements that Holdner alleges, Holdner sustained no injury and thus lacks standing to bring such a claim. Conversely, if the "tender offer" in the Amended Complaint refers to Kreitzberg's purchase of shares in connection with the Plan, then Holdner (as a major shareholder of the Debtor) at least has a colorable basis for standing. 11 U.S.C. § 1109(b). Thus, the second interpretation is more favorable to Holdner.

[11] To the extent that Mr. Holdner's references to a tender offer refer to something other than the April 2015 Offer *or* Kreitzberg's purchase of shares under the Plan, dismissal of the first claim is warranted because Holdner has failed to allege when and how Kreitzberg made the alleged misleading statements. *See Tracht Gut LLC v. County of Los Angeles Treasurer & Tax Collector (In re Tracht Gut LLC)*, 503 B.R. 804, 810 (9th Cir. BAP 2014) ("A dismissal under Civil Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory.").

whether they were or not, in a prior suit between the same parties on the same cause of action." (*quoting Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992) (internal quotation marks omitted, emphasis by *Nutronics* court)); *M&I Thunderbird Bank v. Birmingham (In re Consolidated Water Utils, Inc.)*, 217 B.R. 588, 590 (9th Cir. BAP 1998) ("A plan confirmation order precludes the raising of issues which could or should have been raised during the pendency of the case.").

The stock sale was also thoroughly analyzed in the trustee's Disclosure Statement.  Discl. Stmt. at 7 and 19-22.  Indeed, the elements of Holdner's first claim in the Amended Complaint echo some of the grievances contained in his earlier Disclosure Statement Objection.  To the extent that the first claim refers to supposed misleading statements in the Disclosure Statement, it must be dismissed because Kreitzberg was not the document's author or proponent, nor did Holdner appeal the court's order approving the Disclosure Statement.  In any event, Holdner's grievances regarding the Disclosure Statement were considered as part of the confirmation process and are therefore also subject to preclusion based on the 2016 Appeal.  *See* Conf. Ruling, 561 B.R. at 848 (addressing and overruling Holdner's objections to the adequacy of the disclosure statement).

Admittedly, the Plan and Disclosure Statements only referred to the general process for selling new shares of Debtor's common stock.  Richard Kreitzberg was not identified as the specific purchaser until the court entered the Stock Issuance Order.  But Mr. Holdner did not appeal the Stock Issuance Order; thus, to the extent that Holdner's first claim involves any of the matters adjudicated by the Stock Issuance Order, Holdner has waived the ability to seek review of those matters by failure to raise them in a timely appeal.  *Turner v. Wells Fargo Bank NA (In re Turner)*, 859 F.3d 1145, 1148 n.4 (9th Cir. 2017).

Finally, in the July 1 Order, the court allowed one additional opportunity for clarification of the first claim for relief by inviting Mr. Holdner to provide the details of any misrepresentations that form the basis for the claim, "[t]o the extent not already provided in response to" the court's more specific questions.  Jul. 1 Order at 6.  Mr. Holdner's response to this invitation is as follows: "Without an appraisal of the Corporation's underlying assets and

misrepresentations in the purchase of Data Systems Inc. stock, Kreitzberg has been able to enrich himself to the detrement [*sic*] of the minority shareholders." Holdner Decl. at 5. This statement in the Holdner Declaration is simply a conclusory allegation of misrepresentation, without any actual description of such an alleged misstatement could have injured the plaintiff (the court is aware of no theory under which Mr. Kreitzberg's failure to obtain an appraisal would be actionable by Mr. Holdner).[12]

Because any type of claim for misrepresentation in connection with the issuance of new shares to Mr. Kreitzberg is subject to the doctrine of claim preclusion, I will enter an order dismissing the first claim for relief with prejudice.

## B. Breach of Contract

Mr. Holdner's second claim is styled as one for "breach of contracts." The Amended Complaint does not identify what contract or contracts have allegedly been breached, and no fair inferences in that regard can be drawn from the various documents Holdner has filed in this proceeding. In its July 1 Order, this court invited Mr. Holdner to "[d]escribe with particularity: (i) the contract that forms the basis for the second claim for relief, and (ii) the actions or omissions which constitute a breach of that contract." Jul. 1 Order at 6. Mr. Holdner's declaration responds to this question by referring the reader to Holdner's response to an earlier question.[13] That response, incorporated by reference, reads as follows:

> The basis for the amended complaint are that Krietzberg [*sic throughout*] under his control and management of Data Systems, Inc. is incurring substantial losses which has a detrimental impact on the minority shareholder investment interests.
>
> Krietzberg in the purchase of the other shareholders['] shares was undertaken by him by misrepresentation, in a deceitful and deceptive practice by the omission of material factual information that included Federal and State tax representations that were false, derogatory information about the management and the actual per share value of the underlying assets in the corporation.

---

[12] Holdner's confusing argument that Kreitzberg should have obtained an appraisal mirrors his unfounded arguments at confirmation that the Trustee failed to obtain an appraisal of the Debtor's assets. As Judge Dunn explained during the confirmation hearing, Ms. Mitchell had, in fact, obtained an adequate appraisal. Conf. Hrg. Tr. at 147:4-14.

[13] Specifically, in answering the July 1 Order's question regarding the breach-of-contract claim, Holdner directs the reader to his response to the question labeled "d" in the July 1 Order. Question "d" asked Holdner to describe certain false and material representations, and other violations of law that were alleged in ¶ 25 of the Amended Complaint.

> Krietzberg in his "Tender Offer" of $7.00, in a contract to purchase, had reason to believe the offer was significantly less than the value based on an appraisal of the underlying assets. Without full disclosure it was fraudulent and constitute [*sic*] violations under SEC Rule 10b-5.

Holdner Decl. at 4. Neither this befuddled jumble of prolixity nor the text of the Amended Complaint provides a "short and plain statement of the claim showing that the pleader is entitled to relief," as required by Federal Rule of Civil Procedure 8(a)(2) (applicable here via Federal Rule of Bankruptcy Procedure 7008). Most notably, Holdner has yet to identify the contract under which he is suing. Nonetheless, this portion of the Holdner Declaration does provide a important clue regarding the underlying factual basis for the second claim for relief: the only reference to a contract is "a contract to purchase" for $7 per share. This still does not differentiate between the April 2015 Offer and the sale of new shares under the confirmed Plan (both were for $7 per share), but the declaration provides a further hint: Holdner references "the purchase of the *other shareholders['*] shares" (emphasis added). Kreitzberg's purchase of newly issued shares under the confirmed Plan did not involve any other shareholders, since the shares were purchased directly from the reorganized Debtor. Thus, by process of elimination, the second claim for relief must be based on an alleged breach of the April 2015 Offer.[14]

Since the second claim for relief is for breach of a prepetition contract to which the Debtor was not a party, it implicates no discernable bankruptcy issues and is outside this court's jurisdiction. Ordinarily, if I find that this court lacks jurisdiction over a claim, I would dismiss it; however, that is not fair to Holdner, since he chose to file his complaint in District Court, not here. I am aware of no mechanism that allows me to refer a claim to District Court; accordingly, I believe the most sensible resolution is for me submit the following report and recommendation to the District Court: this court appears to lack jurisdiction over the second claim, and therefore I respectfully recommend that the District Court withdraw its reference of this claim pursuant to 28 U.S.C. § 157(d) and District Court Local Rule 2100-4. In the interest of judicial efficiency, I respectfully recommend that the District Court enter judgment for the Defendants on the second claim, since Holdner lacks standing to bring such claim because there is no evidence in the

---

[14] Richard Kreitzberg's testimony at the confirmation hearing indicates that the April 2015 Offer is the only tender offer he made in connection with Debtor. Conf. Hrg. Tr. at 9:11-15.

record that he entered a contract with Kreitzberg for the purchase and sale of shares, nor is there any evidence that Holdner was an intended beneficiary of the April 2015 Offer. *See Orff v. U.S.*, 358 F.3d 1137, 1145 (9th Cir. 2004) (to bring a contract claim, plaintiff must either be a party or shows that "the contract was made for its direct benefit").

C.    Breach of Fiduciary Duties (Kreitzberg Defendants)

The third claim for relief alleges that the Kreitzberg Defendants, in their management of the reorganized Debtor, have committed various acts of mismanagement. Amend. Compl. ¶¶ 24, 26, 28-30. The Kreitzberg Defendants did not have any management position with the Debtor until after the Plan was confirmed and consummated. *See* Discl. Stmt. at 8-9 (discussing Debtor's prepetition management); Final Report ¶¶ 42-47 (post-confirmation election of new directors); Declaration of Steve Kreitzberg (ECF No. 22) ¶ 4. Thus, by definition, this claim involves post-confirmation acts, thereby implicating the specialized jurisdictional test for post-confirmation "related to" jurisdiction under 28 U.S.C. § 1334(b).

The scope of related-to jurisdiction is quite broad. In recognition that the normal scope of related-to jurisdiction could be *overly* broad once a chapter 11 plan has been confirmed, the Ninth Circuit Court of Appeals has adopted a more narrow standard for post-confirmation matters. The "close nexus" test allows the bankruptcy court to exercise jurisdiction over "matters affecting the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Wilshire Courtyard v. Calif. Franchise Tax Bd. (In re Wilshire Courtyard)*, 729 F.3d 1279, 1287 (9th Cir. 2013) (internal quotation marks omitted).

Here there is nothing remotely akin to a close nexus between the substance of the third claim for relief and the confirmed Plan. Notwithstanding Mr. Holdner's numerous protestations to the contrary, the Plan did not install or otherwise designate the Kreitzberg Defendants as post-petition directors or officers of the reorganized Debtor. Any positions of corporate leadership that the Kreitzberg Defendants now occupy were conferred via a vote of the shareholders conducted in accordance with applicable nonbankruptcy law. Plan § 14.4; Final Report ¶¶ 42-47; Kreitzberg Decl. ¶ 4. The management decisions that Mr. Holdner complains of in connection with his third claim for relief were not ordained or even anticipated by the Plan.

Accordingly, the third claim for relief is a garden-variety state law claim for breach of fiduciary duty that does not implicate this court's jurisdiction. Because this court lacks jurisdiction, I again recommend that the District Court withdraw its reference of this claim pursuant to 28 U.S.C. § 157(d) and District Court Local Rule 2100-4.

D.     Breach of Fiduciary Duties (Estate Professionals)

As his fourth and final claim, Mr. Holdner accuses the Estate Professionals of various breaches of fiduciary duty. Holdner begins by alleging that the Estate Professionals "conspired with Defendant Richard Krietzberg [*sic*] and were complicit in a scheme to obtain control of Data Systems, Inc. in the issuance of additional authorized, unissued stock as proponents of the Plan of Reorganization." Amend. Compl. ¶ 31. Since Holdner has not pleaded a claim for conspiracy, I interpret this paragraph as an allegation that the Estate Professionals were predisposed to favor Mr. Kreitzberg's eventual accumulation of a voting majority of shares. This is easily disproven by a simple review of the record in this case. Mr. Kreitzberg obtained a controlling interest in the reorganized Debtor by purchasing shares that were issued pursuant to the confirmed Plan. *See* Final Report ¶ 27. *Anyone* was able to submit a competing bid to purchase those shares. *See* Notice of Right to Submit Bid (Main Case ECF No. 212). Nothing in Mr. Holdner's Amended Complaint or in the record suggests anything other than conscientious professionalism (under unusually difficult circumstances) on the part of the Estate Professionals.

Paragraphs 33 through 37 all allege that the Estate Professionals made various errors in respect to the Plan or the Disclosure Statement. As previously mentioned, these issues were litigated in the 2016 Appeal and are subject to claim preclusion.

Mr. Holdner has complained about the conduct of the Estate Professionals since at least September 2016. *See* Motion to Terminate Appointment of Trustee (Main Case, ECF No. 145). None of Mr. Holdner's various grievances in this area have been found to have any merit. *See* USDC Opinion on Appeal at 19 ("While the captioned title of [his brief] indicates that Holdner questions Mitchell's disinterestedness, none of his statements or allegations implicate this assertion. Rather, the six specifications Holdner relies on all relate to how Mitchell conducted her investigation before determining that a Reorganization Plan was the best approach."). The

fourth claim for relief in this proceeding is a repackaging of various arguments that have been considered and rejected previously in this case. Accordingly, the fourth claim will be dismissed with prejudice, and further claims against the Estate Professionals are barred by the terms of the injunction that will be entered pursuant to the Release Clause. Conf. Order at 3 (amended § 14.3 of the Plan).

## IV. Vexatious Litigant Motion

In light of Mr. Holdner's extensive history of litigation, the Kreitzberg Defendants ask this court to enter an order "labeling William Holdner a vexatious litigant, and requiring that he obtain permission from the court before filing any pleadings in this Court or any court in the U.S. District Court for the District of Oregon." Vexatious Litigant Mot. at 3. While the Estate Professionals are already insulated against further claims by Mr. Holdner (pursuant to the Release Clause), the Kreitzberg Defendants are not similarly protected. In my twenty years as a judge, I have never entered a vexatious litigant order, but I believe this to be the rare case in which such extraordinary relief is warranted.

This court is well acquainted with the unique challenges presented by *pro se* litigants, and I have extensive personal experience with parties (both represented and not) who zealously and emotionally pursue their claims, sometimes to the point of excess. Typically, such parties will either accept the ruling of this court or seek review by higher courts until they have exhausted their appeals. In contrast, Mr. Holdner's filings and oral statements indicate that he will not accept a final judicial determination that does not align with his personal beliefs about what is right. The complaint initiating this proceeding is based largely on allegations that have already been fully adjudicated by this court and reviewed by the appellate courts. Holdner has expressly promised that he will continue pressing these arguments until he gets what he wants. This indicates the need for an injunction that restricts Holdner's ability to commandeer the time and resources of the opposing parties and this court through the assertion of baseless claims. At the same time, I am mindful of case law that requires vexatious litigant orders to be narrowly tailored. As discussed below, I believe the record supports entry of a prefiling order, and I will craft such order so as to not unduly burden Mr. Holdner's ability to advance nonfrivolous

arguments.  I will also transmit this opinion to the District Court as a report and recommendation for entry of a similar order in that court.

A.    Standards

Federal courts are authorized "to regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances."  *De Long v. Hennessey*, 912 F.2d 1144, 1145 (9th Cir. 1990); *see also Szanto v. Szanto (In re Szanto)*, 2019 WL 6332372, Adv. Proc. No. 16-3114-pcm, at *16 (Bankr. D. Or. Nov. 25, 2019) (same power is extended to bankruptcy courts).  This power includes the ability to require that a vexatious litigant obtain judicial approval prior to filing documents in federal court, although such orders are extraordinary and can only be entered upon a finding of "flagrant abuse" of the judicial process. *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007).

The Ninth Circuit has articulated both procedural safeguards and substantive factors that a trial court must address when weighing a request for a prefiling order.  The framework used by the Ninth Circuit has evolved over time.  In *Delong*, the court established four factors applicable to vexatious litigant determinations—the court must: (1) give litigants notice and an opportunity to oppose the entry of a prefiling order, (2) compile an adequate record, including a list of all the cases and motions that led the court to conclude that a prefiling order was necessary, (3) "make substantive findings of frivolousness or harassment," and (4) "tailor the order narrowly so as to closely fit the specific vice encountered."  *De Long*, 912 F.2d at 1147-1148.  Later, the Ninth Circuit characterized the first two factors as procedural protections, and the remaining two to as substantive inquiries.  *Molski*, 500 F.3d at 1057-1058.  Elaborating on the substantive inquiry, the court favorably cited *Safir v. U.S. Lines*, 792 F.2d 19, 24 (2d Cir. 1986), which instructs courts to consider five factors when considering a prefiling order:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*Molski*, 500 F.3d at 1058 (*quoting Safir*, 792 F.2d at 24). I will begin with the procedural issues, followed by consideration of the substantive issues raised by the *Safir* factors.

B.    Procedural Safeguards

    1.    Notice and an Opportunity to be Heard

The Kreitzberg Defendants filed the Vexatious Litigant Motion on June 7, 2019, and served Mr. Holdner with a copy the same day. Vexatious Litigant Mot. at 15 (certificate of service). Mr. Holdner filed a seven-page response on June 24, 2019, most of which is devoted to arguing the merits of previous litigation. ECF No. 24. Mr. Holdner was also able to address the Vexatious Litigant Motion at the status hearing held on September 24, 2019.

    2.    History of Litigation

As part of affording due process, Ninth Circuit law requires that I making findings concerning Holdner's history of litigation. The Kreitzberg Defendants cite fifteen cases, from various courts, where Mr. Holdner has brought unsuccessful claims as a *pro se* litigant. *See* Declaration of Sandra S. Gustitus (Jul. 27, 2018) (ECF No. 20). While this volume of cases suggests a propensity to litigate, just because Holdner lost each of the fifteen cases does not necessarily mean every one of those cases was frivolous. *See Pavilonis v. King*, 626 F.2d 1075, 1079 (1st Cir. 1980) ("[L]itigiousness alone will not support [a prefiling] injunction against a plaintiff."). Upon review, I find find that most of the cases cited in the Gustitus Declaration are not relevant to the present motion. I do, however, take judicial notice of two previous judicial rulings that are relevant. First, the District Court's opinion in *Holdner v. Coba*, Case No. 15-2039-AC, found that Holdner's complaint in that proceeding "was frivolous, unreasonable, or without foundation." 2016 WL 6662687, at *1 (D. Or. Nov. 9, 2016).

The second case I believe is relevant is *In re Pardue*, which was the subject of a 2010 ruling by the Multnomah County Circuit Court. *See* Gustitus Decl., Exh. 16. *Pardue* involved two trusts that Holdner and Jane Baum (who also figures in this case) administered as co-trustees. According to the court's findings, Holdner and Baum made a litany of negligent errors in supervising the trusts, which led to protracted litigation. In awarding attorney fees to the trust beneficiaries, the court noted that "[s]adly . . . due to choices made by Holdner and Baum, the

bulk of [the opposing parties'] fees were reasonable and necessary to accomplish what . . .

otherwise should have been a relatively inexpensive business transaction." *Id.* at 7. While the

trust litigation was underway, Holdner also apparently filed a *pro se* challenge to the settlor's

will, a filing that the court characterized as "inexplicable" and "contain[ing] serious and wholly

unsubstantiated allegations." *Id.* The court "overwhelmingly conclude[d] that the will contest

was driven by Holdner's financial self interest to protect his nomination as personal

representative and to provide him with a vehicle to collect the fees that position would generate

as well as the specious fees claimed for trustee duties." *Id.*

In addition to the two aforementioned cases, Holdner's conduct in this court also provides

evidence supporting a finding that he is a vexatious litigant. As elaborated below, Holdner's

conduct in these proceedings has burdened the court, caused unnecessary expenses for opposing

parties, and bespeaks a lack of respect for the judicial process. This track record of meritless and

duplicative arguments provides a sufficient record upon which to make the necessary finding.

Specifically, in Debtor's chapter 11 case between the petition date and the confirmation

date, Holdner filed three motions,[15] five objections,[16] and three other documents.[17] Since

confirmation of the Plan, Holdner has filed seven motions[18] and two other documents[19] in the

chapter 11 case (not including appeal-related documents). None of Holdner's filings in the

chapter 11 case have raised meritorious issues.

---

[15] Main Case, ECF Nos. 95 (sale motion), 145 (motion to terminate appointment of trustee), and 182 (renewed motion to terminate appointment of trustee).

[16] Main Case, ECF Nos. 143 (objection to disclosure statement), 181 (objection to second amended disclosure statement), 183 (objection to confirmation), 185 (objection to special counsel's employment application), and 203 (objection to relief from stay).

[17] Main Case, ECF Nos. 115 (unauthorized reply in support of sale motion), 144 (request for hearing), and 184 (renewed request for hearing).

[18] Main Case, ECF Nos. 249 (motion for production of documents), 256 (motion for production of documents), 265 (motion for production of documents), 266 (motion to compel production of documents), 340 (motion for class certification), 343 (motion to designate interim attorney), and 355 ("request to determine the court procedure in a resolution of a shareholder dispute").

[19] Main Case, ECF No. 363 (captioned "Response to Richard Kreitzberg's Objection to Convert Chapter 11 to Chapter 7," despite the fact that no party has filed a motion to convert), 365 ("Response to Richard Kreitzberg's Acceptance of Class Certification," also a confusing title, given that Kreitzberg has filed no such acceptance).

Holdner has also filed a series of frivolous documents in the appellate courts. Since May of 2019, every time this court has entered an order with which Holdner disagrees, he has (without seeking relief under Federal Rule of Bankruptcy Procedure 9023 or 9024) filed various documents with the Ninth Circuit purporting to "appeal" this court's decisions. *See* 2019 Appeal ECF Nos. 4 ("Appeal of Order"), 8 ("Appeal of Adversary Proceeding"), 13 ("Appeal of Motion Denying Discovery and Extension in Adversary Proceeding"), and 16 ("Appeal of Denial of Discovery and Award of Attorney Fees").[20]

Holdner's filings generally focus on various iterations of the argument that Ms. Mitchell or Richard Kreitzberg has made various business judgments with which Holdner disagrees. He also raises procedural arguments ancillary to these grievances, although his procedural challenges rarely have merit and Holdner himself has violated numerous procedural rules, both large and small. Holdner presented his arguments as part of the confirmation process and lost. He then pursued his appeals (as is his right), and lost in the District Court and the Court of Appeals. As discussed in more detail in the following section, Holdner has made clear that his previous losses will not deter him from making the same arguments and fighting the same fights again, *ad infinitum*. Thus, I find that Holdner's conduct in Debtor's chapter 11 case (and associated adversary proceedings), along with the findings in the aforementioned *Coba* and *Pardue* cases, provide an adequate basis upon which to determine that Holdner is a vexatious litigant.

C.     Findings of Frivolousness and Harassment

To make the requisite findings of frivolousness and harassment, a trial court must discern the litigant's motive and whether he has imposed needless expense or burdens on opposing parties and the courts. *Molski*, 500 F.3d at 1058 (citing *Safir* factors 2 and 4). In examining a litigant's motive, a court is to pay particular attention to whether the litigant has "an objective good faith expectation of prevailing." *Safir v. U.S. Lines*, 792 F.2d 19, 24 (2d Cir. 1986). To the extent that Holdner had a good faith basis for his objections to confirmation, such a basis can no

---

[20] The Court of Appeals appears to have docketed these filings and taken no further action.

longer exist now that his objections were overruled and a final judgment has been entered and affirmed on appeal. As explained below, I find that Holdner does not have a good-faith basis for the arguments he is currently pursuing, and his litigation tactics have imposed unnecessary burdens on the Estate Professionals, the Kreitzberg Defendants, and this court.

      1.    <u>Holdner's Litigation is the Product of a Grudge against Richard Kreitzberg</u>

The origin of Holdner's motives can be traced back to February 2015, when Debtor (under Holdner's management), negotiated a contract to sell its main office building to a buyer for $5 million, with a 20% down payment and the balance to be paid by the purchaser over five years. Main Case ECF No. 95, Exh D (purchase and sale agreement). Richard Kreitzberg filed the State Court Litigation in an effort to prevent this sale. Conf. Ruling, 561 B.R. at 840. Early in the chapter 11 case, Holdner sought court approval for a sale that was essentially the same as the prepetition sale he had negotiated, but involving a different purchaser. The Trustee and Richard Kreitzberg successfully opposed Holdner's sale motion. *Id.* at 841. The Trustee then formulated the Plan, with the goal of recapitalizing the Debtor and rehabilitating its real property.

By Holdner's own admission, his fight against confirmation of the Plan was motivated by a belief that the sale he negotiated was superior to the Trustee's plan for reorganizing the Debtor. Conf. Hrg. Tr. at 74:20-75:10, 78:12-80:9, 87:8-14. Of course, disagreements over when or whether to sell assets are common in bankruptcy proceedings. What makes Holdner's battle more unusual is that he has turned a financial disagreement into a personal vendetta against Richard Kreitzberg (and, to a lesser but not insignificant extent, Ms. Mitchell, who apparently earned Holdner's scorn by not being adversarial to Kreitzberg). Indeed, during the confirmation hearing, Holdner stated that he opposed confirmation of the Plan because of unsubstantiated allegations that Richard Kreitzberg "badmouths the people that buy the [Debtor's common] stock" (*id.* at 128:25-129:1) and because "he's going to screw them [the shareholders] over, and it shouldn't be allowed to happen in America" (*id.* at 134:11-12). If Holdner had been able to prove any type of misconduct on the part of Kreitzberg, his current protestations might carry some weight; but, after years of fighting, Holdner has not succeeded in proving anything other than a disagreement over the exercise of business judgment.

2.      Holdner's Claim that He Represents the Interests of Minority Shareholders Lacks Credibility

While Holdner admits to being motivated by a grudge against Richard Kreitzberg, he also claims to be acting in the best interests of shareholders. I find that whatever credibility this argument may once have had, it is no longer plausible. When first opposing confirmation of the Plan, Holdner appeared with fellow shareholders Jane Baum[21] and Gary Maffei, both of whom were major shareholders. *See e.g.*, Cramdown Obj. (Main Case ECF No. 183) at 4. Holdner claimed to be acting at the behest of small minority shareholders, even though Ms. Mitchell showed that most or all of these shareholders had subsequently changed their minds and no longer opposed confirmation. *See* Trustee's Mem. ISO Confirmation ("Confirmation Memorandum," Main Case ECF No. 196), at 21 n.4. Ultimately, of the 25 shareholders who submitted ballots, all voted to confirm the Plan, except for Baum, and Maffei.[22] Ballot Summary, Main Case ECF No. 191. Baum and Maffei have not joined Holdner in his post-confirmation filings,[23] nor is there any suggestion that any other shareholder supports Holdner's Quixotic battle to relitigate confirmation of the Plan. Moreover, even if Holdner *believes* he is acting on behalf of shareholders, such subjective beliefs should not elide the more important point that Holdner's litigation tactics are objectively not in the best interest of shareholders. The Debtor ended up in chapter 11 in part due to wasteful litigation perpetrated by Mr. Holdner, and the estate's litigation-related expenses in this proceeding are being paid by the Debtor, thereby diminishing the value of the shareholders' stock. Notwithstanding the substantive weaknesses of Holdner's theories, he pursued his arguments through the appellate courts and lost. Now, rather than accepting the finality of a judgment, Holdner seeks to relitigate the issues on which he has already lost—a strategic approach that provides no benefit to shareholders but does deplete corporate resources.

---

[21] Jane Baum is Holdner's business partner. *See* Discl. Stmt. at 10.

[22] Holdner also attempted to cast a dissenting ballot on account of shares he did not own; Mitchell disallowed those votes.

[23] As discussed in the following paragraph, Baum is no longer a shareholder. The court is unaware of whether Maffei continues to hold shares of the Debtor's common stock.

Another experience leads me to doubt that Holdner has the best interests of shareholders in mind. Following confirmation, Ms. Mitchell, in her capacity as the plan agent, served all known shareholders with a notice of opportunity to sell their shares to Richard Kreitzberg pursuant to the confirmed Plan. Final Report ¶¶ 30-31. Twenty-three shareholders elected to sell their shares. *Id.* ¶¶ 32-33. When it came time to close the twenty-three sales transactions, Holdner and Baum (both of whom had submitted elections to sell), refused to either tender their shares or revoke their elections to sell. *Id.* ¶ 36. This caused Ms. Mitchell to file Adversary Proceeding No. 17-3023-tmb (the "Interpleader Action"), interpleading the sales proceeds and asking for a judicial resolution. Richard Kreitzberg subsequently moved for summary judgment, asking that Holdner and Baum's contracts to sell shares be rescinded and that Ms. Mitchell be ordered to return the funds that Kreitzberg had tendered for the purchase of those shares. Interpleader Action, ECF No. 49. The court declined to enter an order on Kreitzberg's motion until Baum personally appeared so that the court could explain that the decision to sell was hers alone, and that she should make the decision based on her own interests, not Mr. Holdner's.[24] Ms. Baum appeared in court on June 19, 2017 and stated that she was awaiting the Ninth Circuit's ruling in the then-pending 2017 Appeal, and that she and Holdner "just always held our block of stock together." I informed Baum that Holdner had not appealed the Stock Issuance Order, and I stressed that Baum's situation was materially different than Holdner's, and she should not merely "ride his coattails."[25] Following the hearing, Ms. Baum tendered her shares and completed the transaction; Holdner did not. Plan Agent's Report, Interpleader Action ECF No. 73. This experience suggests to me that even those shareholders who do appear to support Holdner's combative tactics may change course once they receive an unbiased and accurate explanation of the facts.

---

[24] The posture of Holdner's sale was complicated by the fact that the Internal Revenue Service asserted a federal tax lien against Holdner's assets—a factor that was not present in Baum's situation.

[25] I would add that my experience with Ms. Baum as part of this case echoes the Multnomah County Circuit Court's finding in *Pardue* that Baum, while nominally in charge of the trusts at issue in that case, was in fact "truly an inactive trustee" who relied on Holdner to make all management decisions. *See* Gustitus Decl, Exh. 16, at 6.

In sum, I find that Holdner's invocation of the interests of other shareholders is not supported by the record, and that Holdner's actions in the current proceeding are not beneficial to the shareholders for whom be purports to be acting.

### 3. Holdner's Own Admissions Display a Lack of Respect for the Judicial Process

Not only does Holdner appear to be motivated by personal animus, but this motivation manifests as a stated strategy of rehashing the same arguments until Holdner eventually gets the result he wants. This dynamic is vividly illustrated in a particular colloquy with the court, which took place at the September 24 Hearing. About twenty minutes into the hearing, Holdner began arguing that the Plan should not have been confirmed. The following exchange then took place:

COURT:  You lost on that argument. You lost with Judge Dunn—

HOLDNER: [Section] 1129(b) says you have to have an appraisal.

COURT:  You lost with Judge Dunn, you lost at the District Court, and you lost at the Ninth Circuit on that.

HOLDNER: But that didn't mean anything to me. That doesn't mean anything to me.

COURT:  OK, I'm done.

HOLDNER: What means to me is the three hundred deals that this court, bankruptcy court is to protect those people. They're not— I shouldn't have to be frightened to protect those three hundred people, it should be this court, and that's the function of this court.

COURT:  You already lost on that argument.

HOLDNER: That's what the Bankruptcy Court is the function—

COURT:  You lost in the Bankruptcy Court, you lost in the District Court, and you lost at the Ninth Circuit on those issues. So, no.

HOLDNER: You lost in— I don't know what you're referring to.

COURT:  Well, you said that the price that Mr. Kreitzberg paid wasn't enough.

HOLDNER: Listen, ma'am, your honor, you gotta understand where I come from.

COURT:  I do understand where you come from.

HOLDNER: Kreitzberg is getting this company for $7 a share, he's screwing these shareholders over. He's screwing them out of their money. He's frauding us.

COURT:  That is not what Judge Dunn held, what the District Court judge—

HOLDNER: But listen, that's what we're going to prove here. I'm going to prove to you beyond any doubt.

COURT:  You're not, you cannot retry that issue.

HOLDNER: Yes, you— It's going to be the issue, because it's going to get into the appeals.

COURT:  OK, you already appealed that, and you lost.

```
HOLDNER:   I haven't lost.
COURT:     You did.
HOLDNER:   I have not lost.  You wait—
COURT:     You lost—
HOLDNER:   If you think I've lost, you just misjudged me, your honor.  I never stop
           when there's—  When I believe I'm right, I never give up.
```

I believe that the foregoing dialogue demonstrates three important aspects of Holdner's approach to this litigation.  First, Holdner plainly proclaims that he has no intent to honor the finality of a judgment.  His philosophy is fundamentally incompatible with the concept of *res judicata*, a well-established doctrine that serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).  In fact, courts are expressly allowed to employ injunctions in order to ensure that the principles of *res judicata* are effectuated.  *California v. IntelliGender, LLC*, 771 F.3d 1169, 1181 (9th Cir. 2014) ("To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." (*quoting Montana v. U.S.*, 440 U.S. 147, 153-154 (1979) (internal quotation marks omitted)).

Second, Holdner will obstinately press meritless arguments even after such argument has been rejected.  In the passage above, Holdner once again argues that Richard Kreitzberg is "screwing" shareholders by purchasing stock at $7 per share.  Setting aside the obvious fact that Holdner does not have standing to complain of imagined injuries to other parties, Holdner's math has been rejected numerous times.  As part of the confirmation process, Ms. Mitchell justified the sales price of $7 per share by noting that it represented a premium over the $6.58 per share that shareholders would likely receive upon a liquidation of the Debtor in chapter 7.  Discl. Stmt, Exh. A; Conf. Mem. at 13-14.  Holdner countered by arguing that a liquidation would actually yield proceeds of $9.51 per share.  In advance of the confirmation hearing, Ms. Mitchell pointed out that Holdner's calculations did not account for payoff of the mortgage secured by the

property, satisfaction of Debtor's current liabilities, costs of sale, payment of several years of unpaid property taxes, administrative expenses of the chapter 11 case, or the possibility of a default by Holdner's proposed purchaser on the five-year note that represented the deferred balance of the purchase price. Conf. Mem. at 14-15. At the confirmation hearing, Holdner continued to advance the $9.51 figure, without providing even a cursory response to Mitchell's detailed rebuttal.[26] Conf. Hr. Tr. at 73:19-82:13. Characterizing Holdner's obviously flawed calculations as "surprising and disingenuous," Judge Dunn ruled that the $7 per share purchase price was fair and equitable because it allowed shareholders to either sell their shares at a premium over liquidation value, or retain their shares if they preferred. Conf. Ruling, 561 B.R. at 845, 847. On appeal, the District Court conducted a thorough review of the record and determined that "[i]n this appeal, Holdner presents no basis for concluding that the Bankruptcy Court's finding concerning valuation was illogical, implausible or without support in the record." USDC Opinion on Appeal, at 13 (citation and internal quotation marks omitted). The Ninth Circuit affirmed. As shown by the colloquy at the September 24 Hearing, Holdner has no intent of relenting in his battle to push this meritless argument.

Other instances of obstinacy include Holdner's conduct at the confirmation hearing, when—for example—he attempted to argue with Ms. Mitchell about what he believed was a failure of the Disclosure Statement to adequately address the Plan's potential tax consequences.[27] Conf. Hrg. Tr. at 88:22-89:19. Judge Dunn ultimately cut off this line of questioning, noting that it was "not productive" and "utterly argumentative." *Id.* 90:6-8. Yet a mere forty seconds later, Holdner attempted to return to this topic, bizarrely arguing that he should be able to question Ms. Mitchell about the tax consequences because "[s]he is not an expert in the tax law." *Id.* 92:14-15.

Perhaps the leading example of Holdner's stubborn refusal to accept a judicial ruling can be found in his criticisms of the Disclosure Statement. Holdner filed two objections to different

---

[26] One particularly illustrative issue concerned Holdner's own claim against the Debtor for approximately $1.5 million in unpaid back salary. *See* Main Case, Claim No. 10-1. When Judge Dunn asked Holdner to admit that his liquidation analysis did not include payment of this claim, it took two minutes of repeated questioning to get past Holdner's equivocal responses and finally get him to admit that his calculations did not, in fact, provide for such payment. Conf. Hrg. Tr. at 70:4-71:25.

[27] In fact, the Disclosure Statement included such an analysis at pages 30-31.

versions of the disclosure statement. The court entered an order approving Ms. Mitchell's Disclosure Statement on October 6, 2016 (Main Case, ECF No. 164), and Holdner did not appeal that order. At the confirmation hearing, Holdner continued to argue about the inadequacy of the Disclosure Statement. Judge Dunn informed Holdner no less than four times that the adequacy of the disclosure statement had already been decided, and was not subject to appeal. Conf. Hrg. Tr. at 101:3-8; 126:11-106; 139:2-13; and 151:12-152:4. Out of an abundance of caution, Judge Dunn addressed Holdner's continued grievances in his ruling, specifically noting each of Holdner's substantive critiques of the Disclosure Statement and explaining the court's rationale for overruling those objections. Conf. Ruling, 561 B.R. at 847-848. Holdner raised the adequacy of the Disclosure Statement again in appealing to the District Court, which found "no evidentiary support for any of" Holdner's allegations. USDC Opinion on Appeal, at 20. The Ninth Circuit affirmed the District Court's affirmance of the Bankruptcy Court. Yet Holdner's complaint initiating this action continues to complain that the Estate Professionals "failed to provide the appropriate analysis of the issues that were necessary in the disclosure statement for the Bankruptcy Court to make an informed rational decision." Amend. Compl. ¶ 36, *see also* ¶¶ 33-34 (similar allegations).

Finally, the record of this proceeding raises grave concern about Holdner's truthfulness and candor before the court. In addition to the previously-mentioned false representation regarding his non-receipt of the court's July 1 Order (*supra*, at p.9), Holdner has made various untrue assertions throughout Debtor's case, concerning matters both trivial and material. On the minor end of the spectrum are statements that are easily disprovable, such as when, in his objection to the Disclosure Statement, Holdner alleged that "[t]he Trustee has stated in the draft plan of reorganization that if Holdner and Baum refuse to sell their shares they will be sued, an act of extortion." Renewal of Shareholders' Obj. to Trustee's Second Amend. Discl. Stmt. (Main Case ECF No. 181), at 4. In fact, neither the Plan nor the Disclosure Statement said anything of the sort, and disproving this baseless allegation is easy.

Other of Holdner's misrepresentations may appear minor, but threaten to mislead other courts as proceedings unfold. On June 5, 2017, this court held a hearing on Holdner's motion to

approve his proposed sale of Debtor's main property. Although the court denied Holdner's sale motion, during the hearing the court noted to Ms. Mitchell's counsel that Holdner's accounting firm had occupied the building for many years without a lease, and there was some possibility that Holdner might be willing to waive his substantial claim against the Debtor in return for some certainty regarding the company's occupancy. The entirety of Judge Dunn's remarks read as follows:

> Mr. Holdner's accounting firm is a special situation, because they're still there. They have never repudiated their obligation to pay rent, whether it's below market or not. And my understanding is there's been an offer to waive a substantial claim. So at least as to that tenancy, I would hope, you know, there would be the parameters within which a resolution that makes sense for everybody could come about pretty quickly.

Jun. 6, 2016 Hrg. Tr. (ECF No. 273) at 8:25-9:8. By September 14, 2016, Holdner embellished this courtroom remark by stating in a written filing that "the Trustee ha[s] disregarded the Court in its instruction that Holdner, Backstrom Baum & Co. should be immediately provided a new lease based on waiving their fees for three years." Shareholders' Obj. to Trustee's Discl. Stmt. (ECF No. 143) at 5. Ms. Mitchell corrected this misstatement in a written response, and Judge Dunn clarified at the confirmation hearing that anything he said in court was an informal observation, not an order of the court. Trustee's Resp. to Shareholders' Obj. (ECF No. 159) at 4; Conf. Hrg. Tr. at 131:3-6. Despite this clarification from the court, Holdner continued to press this misleading narrative on appeal in the District Court. Mem. ISO Review of Confirmation of Plan (2016 Appeal ECF No. 7) at 12; Reply to Appellee's Obj. to Appellant's Motion for Restriction on the Acquisition and/or Transfer of Data Systems, Inc. Stock (2016 Appeal ECF No. 20) at 2. The District Court again found these representations to be without evidentiary support. USDC Opinion on Appeal, at 19-20. Holdner's opening brief in the Court of Appeals once again pressed this false narrative. Appellant's Informal Brief (2017 Appeal ECF No. 5) at 6. Having advanced this inaccurate factual allegation in three courts to no avail, Holdner's Amended Complaint in this action once again parrots the false claim that "[w]hen Amy Mitchell was appointed Trustee of Data Systems, Inc. by the Bankruptcy Court[28] she was instructed by

---

[28] This statement is also inaccurate. Ms. Mitchell was appointed by the United States Trustee, not by this court. *See* Appointment of Chapter 11 Trustee (Main Case ECF No. 79).

Judge Dunn to provide Holdner, Backstrom, Baum & Co. a reasonable lease for providing services to Data Systems, Inc. since they had waived three years of fees in the Chapter 11 Bankruptcy."  Amend. Compl. ¶ 16.

Holdner's refusal to recognize the finality of a judgment, combined with his tendency to repeatedly raise discredited arguments and misrepresent basic facts, leads me to find that he is predisposed to press harassing and duplicative arguments without a good-faith motive.

D.      <u>Expense and Burden on Opposing Parties and the Court</u>

The next part of the inquiry prescribed by *Molski* is an analysis of "whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel."  *Molski*, 500 F.3d at 1058.  The answer to both of these questions is "yes."  Debtor has incurred over $1 million in litigation costs caused by Mr. Holdner.[29]  Kreitzberg Decl. ¶ 3.  While the Estate Professionals have not yet quantified the costs they have incurred in this proceeding, I would note that *any* such costs are particularly troublesome from an equitable perspective: pursuant to the confirmed Plan, Ms. Mitchell's post-confirmation expenses related to her implementation of the Plan are being paid by the Debtor.  Plan § 16.5.  As a matter of bankruptcy law and practice, this provision is routine and fair; however, what makes it troublesome as a practical issue is that Mr. Holdner's baseless claims in this proceeding have led to the Estate Professionals incurring legal fees that are then satisfied from the Debtor's assets, thereby diminishing the value of the stock held by the very shareholders on whose behalf Holdner unconvincingly claims to be fighting.  In addition, Holdner's commencement of this proceeding has delayed the closing of Debtor's chapter 11 case, meaning that the Debtor continues to incur not-insignificant statutory fees that must be paid to the Office of the U.S. Trustee.  *Id.* § 16.19.

As for the court, Mr. Holdner's behavior in this adversary proceeding has multiplied workload during a time when staffing is decreasing and filings are increasing.  *See e.g.*, U.S.

---

[29] It is unclear if this figure includes costs related to the current adversary proceeding, to which the Debtor is not a party.  Specifically, the record is not clear if the Debtor is indemnifying the Kreitzberg Defendants for their litigation costs in this proceeding.

Bankr. Ct., Dist. of Or., 2018-19 Case Filings by Chapter and Month, *available at* https://ecf.orb.uscourts.gov/docs/extrpt/RPTbiyear.html. To begin, Holdner has refused to follow basic rules concerning filing. For example, he has repeatedly filed documents pertaining to this adversary proceeding in the main chapter 11 case. When I advised Holdner of this problem at the May 29, 2019 status hearing, Holdner "objected" and said the court "was just wrong" and he would appeal this basic matter of procedure to the Ninth Circuit. In fact, Holdner became so combative, that when I attempted to show him an example of a correctly-captioned document, Holdner refused to acknowledge the correct form of caption, and attempted to change the topic by blaming the court for delays in noticing (a topic that has nothing to do with filing documents in the correct case). This whole colloquy took over fifteen minutes, and Holdner continues to file documents in the wrong case. *See* ECF No. 51 (letter advising Holdner of continued non-compliance with LBR 9004-2).

On a more substantive note, Holdner's filings present considerable challenges for clerk's office and chambers staff because he is adept at using enough procedural language to raise potentially material issues, while also obfuscating matters to the point where it is difficult or impossible to discern what he is alleging or what relief he is seeking. As a primary example of this dynamic, I would point to the fact that Holdner filed a complaint over nineteen months ago alleging breach of contract, and he has yet to identify the contract that has supposedly been breached, despite having been given numerous opportunities to provide such clarification. While *pro se* litigants are afforded some latitude in regards to procedure and the technicalities of pleading, there is no doctrine allowing unrepresented parties to file documents that are so incoherent that court staff must spend disproportionate time attempting to decipher their basic meaning.

I believe that this court properly discharged its duty as a public agency by patiently hearing and ruling on Mr. Holdner's motions and objections during Debtor's chapter 11 case. But we are now in a different procedural posture: Mr. Holdner has been heard, yet he demands the use of court resources in an effort to rehash the same arguments again. This must stop. As discussed in the following section, I believe a properly structured prefiling order is necessary.

E.      Terms of the Prefiling Order

In crafting the provisions of a prefiling order, I am guided by two factors from *Safir* (as endorsed by the Ninth Circuit in *Molski*). Specifically, I am required to ask whether the litigant is represented by counsel, and whether "other sanctions would be adequate to protect the courts and other parties." *Molski*, 500 F.3d at 1058. I believe the issue of representation is important. The Kreitzberg Defendants seek a prefiling order applicable to "*any* pleadings in this Court or any court in the U.S. District Court for the District of Oregon," arguing that Holdner "has an equally extensive history [of frivolous litigation] being represented by counsel." Vexatious Litigant Mot. at 3, 4 (emphasis added). I am not persuaded that a prefiling order should apply to matters where Holdner is represented by counsel. The Kreitzberg Defendants have not produced any evidence showing that Holdner has pressed frivolous claims when represented by counsel. Moreover, even if Holdner were to assert losing claims through counsel, I believe that many of the most vexatious aspects of his litigation (e.g., incomprehensible pleadings and personal attacks) would not be present if Holdner appeared through an attorney who is governed by the Oregon Rules of Professional Responsibility. I will therefore restrict the prefiling order to actions where Holdner appears *pro se*.

Regarding the potential of other sanctions, I am unaware of any other mechanisms that could effectively address the problems caused by Mr. Holdner. He is not the debtor in this matter, so I cannot withhold a discharge or dismiss the case as a sanction. I have already imposed monetary sanctions under Federal Rule of Civil Procedure 37(a)(5)(B) (*see* Order Awarding Attorney Fees (ECF No. 41)), but this has not stemmed the flow of meritless filings by Mr. Holdner (and most of Holdner's problematic filings are outside the scope of Rule 37's sanctions provisions anyway).

As evinced by Mr. Holdner's conduct at the September 24 Hearing, the true problem is his fundamental disrespect for the nature of the judicial process. Accordingly, I find that a prefiling order is appropriate. I turn now to the scope of such order. The Kreitzberg Defendants seek a prefiling order applicable to "any pleadings" filed in any courts in this district. The term "pleadings" is both too broad and too narrow. Pursuant to Federal Rule of Civil Procedure 7(a),

pleadings consist of complaints and answers. Imposing a prefiling requirement on Mr. Holdner's ability to file pleadings would be too broad insofar as it would unfairly restrict his ability to *answer* claims asserted against him. It would also be too narrow, because it would not impact Holdner's ability to commence frivolous contested matters, which are generally initiated by the filing of a motion. *See* Fed. R. Bankr. P. 9014(a). Accordingly, I will frame the prefiling order as restricting Holdner's ability to commence any adversary proceeding or contested matter. This will allow Holdner to respond to motions and raise objections, but he will not be able to unilaterally multiply the number of proceedings connected to Debtor's case.

The Kreitzberg Defendants also seek a prefiling order that would apply to *any* type of claim that Mr. Holdner wished to pursue. While the District Court may have such latitude, I do not. This court is limited to matters of bankruptcy, and I cannot—for example—restrict Holdner's ability to file a trespass suit against his neighbor. I will thus further restrict the scope of the prefiling order to apply only to any adversary proceedings or contested matters in connection with Debtor's chapter 11 case, or other claims against the Debtor, the Kreitzberg Defendants, or any entity in which any of the aforementioned parties holds a controlling interest.[30]

Consistent with the relief requested in the Vexatious Litigant Motion, the prefiling order will allow Holdner to commence an adversary proceeding or contested matter if he submits (to the judge assigned to Debtor's case) a proposed complaint or motion with a certification that the claims are brought in good faith, have not been previously adjudicated, are supported by evidence, and are not intended merely to harass or delay. If the judge grants permission, then Mr. Holdner may file the complaint or motion.

Finally, I must address the applicability of the prefiling order in other courts. As a preliminary matter, I would note that Holdner has taken contradictory positions regarding what court he wishes to litigate in. When the District Court referred this adversary proceeding to this court, Holdner responded by objecting to the transfer and appealing the Referral Order to the

---

[30] As previously mentioned, the Estate Professionals are not part of the prefiling order because they will be protected by the injunction entered in accordance with the Release Clause.

Ninth Circuit.  Yet at the September 24 Hearing, Holdner stated on three separate occasions that he wanted this matter to stay in the Bankruptcy Court.  Given Holdner's track record, I suspect that he prefers to be in whatever court he thinks is most advantageous to him at any given point in time.  I do, therefore, agree that the prefiling order should apply in other courts; however, the Kreitzberg Defendants provide no authority suggesting that I have such jurisdiction (and, indeed, they appear to acknowledge this court's limited jurisdiction by expressly asking that I make findings and recommendations to the District Court, *see* Vexatious Litigant Motion at 13).  *See also Szanto*, 2019 WL 6332372, at *22.  Accordingly, based on the findings set forth in this opinion, I recommend to the District Court that it also enter a prefiling order, similar in scope to the order entered in this court, limiting Holdner's ability to file new lawsuits against the Debtor, the Kreitzberg Defendants, or any entity in which any of the aforementioned parties holds a controlling interest.

## V.  Conclusion

For the reasons stated in this opinion, the court will take the following actions: (a) enter a judgment dismissing the first and fourth claims for relief, with prejudice, and requiring prefiling approval of any complaint or motion that Holdner seeks to file in this court against the Debtor, the Kreitzberg Defendants, or their affiliates; (b) recommend that the District Court withdraw its reference of the second and third claims for relief in light of this court's lack of jurisdiction; (c) transmit this opinion to the District Court with the recommendation that it find Holdner a vexatious litigant and enter an appropriate prefiling order; and (d) dismiss any pending motions that Holdner has filed in Debtor's chapter 11 case.  In addition, counsel for Ms. Mitchell should submit the Order Enjoining Claims or Causes of Action under Section 14.3 of Plan, as referenced in ¶ 8 of the Confirmation Order so that the court can sign and enter the same.

###

cc:    William F. Holdner
        Sandra S. Gustitus
        Justin D. Leonard